MARY M. OUTWIN, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EDSON S. OUTWIN, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1869–77, 1870–77.    Filed January 28, 1981.

*Richard A. Mullens* and *Bernard D. Bergreen,* for the petitioners.

*Alyce C. Halchak,* for the respondent.

DAWSON, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal gift tax for the year 1969 as follows:

| Petitioner | Docket No. | Deficiency |
|---|---|---|
| Mary M. Outwin | 1869–77 | $167,895.09 |
| Edson S. Outwin | 1870–77 | 167,895.09 |

The only issue presented for decision is whether certain trans-

fers in trust made by each petitioner during 1969 constituted taxable gifts for purposes of section 2501.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein by this reference.

Edson S. Outwin (sometimes hereinafter referred to as petitioner) and Mary M. Outwin are husband and wife and resided in Amherst, N.H., when they filed their petitions in these consolidated cases. Each petitioner filed a gift tax return for 1969 with the Internal Revenue Service at Newark, N.J., on April 15, 1970. The petitioners have been married since 1941 and have three sons and one daughter.

In 1945, Edson S. Outwin went to work for C. R. Bard, Inc. (Bard), a company which manufactured and sold urological products. During his association with Bard, the company prospered and became an important supplier of urological products in this country. Petitioner became a major stockholder and a member of the board of directors. Subsequently, serious disputes concerning the operation of the company arose between petitioner and Harris L. Willets, another major stockholder and member of the board of directors. The hostilities grew worse and at a meeting of the board of directors in 1962, petitioner was removed from his position as an officer of Bard. Thereafter, petitioner resigned from the board of directors, and in 1963, he arranged for a sale of all Bard stock owned by him and his family, including stock which he had gifted to his wife and their four children. After income taxes, the sale netted approximately $2,500,000. These funds were transferred to the investment firm of Stein, Roe & Farnham and placed in six individual custody accounts, one each for petitioner, his wife, and each of their four children.

Petitioner's investment adviser at Stein, Roe & Farnham was Henry B. Thielbar, who was also a neighbor and a good friend of the Outwin family. Another friend and adviser to petitioner was Morris H. Bergreen, an attorney whom Mr. Thielbar had

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise indicated.

introduced to petitioner when his differences with Harris L. Willets began to develop. Both Mr. Thielbar and Mr. Bergreen provided counsel and assistance to petitioner during the troubled times which eventually led to the buyout of his interest in Bard.

In the 5 years following the sale of stock in 1963, petitioner made a number of attempts to reenter the urological supply business. Then, in 1968, he abandoned his efforts and began to take a more active role in the management of the Outwin family investments. After considerable discussion with Mr. Bergreen and Mr. Thielbar, petitioner decided to consolidate the funds placed in the six custody accounts at Stein, Roe & Farnham in order to reduce administrative expenses and permit more efficient asset management. At Mr. Bergreen's suggestion, he decided to employ a family investment partnership as the vehicle for consolidation. Mr. Bergreen's plan called for petitioner to create four irrevocable discretionary trusts and transfer to each an undivided 15-percent interest in his investment account at Stein, Roe & Farnham. The remaining undivided 40-percent interest was to be transferred to a revocable trust. Similarly, Mary M. Outwin was to establish an irrevocable discretionary trust and a revocable trust, to which she would transfer undivided interests in her custody account equal to 60 percent and 40 percent, respectively. The four children were to form a partnership in which their capital contributions would be the balance in their respective custody accounts. Finally, the children's partnership, the two revocable trusts, and the five irrevocable discretionary trusts were to form a partnership to which each partner-entity would contribute its interest in the Stein, Roe & Farnham custody accounts. By consolidating the family portfolio in this manner, petitioners and Mr. Bergreen hoped not only to reduce administrative expenses and increase investment yield, but also to save Federal income taxes and avoid probate on the trust assets upon the death of the settlors.

Subsequent to this proposal, Mr. Bergreen and Mr. Thielbar had various discussions with petitioner, his wife, and their children to discuss the legal and financial ramifications of the family investment company. Since Edson Outwin was no longer actively involved in business, both he and his wife felt that the income from the trust funds would be insufficient to meet their needs and that invasions of corpus would be necessary from time to time. Accordingly, Mr. Bergreen and Mr. Thielbar made it

clear that the funds to be placed in his irrevocable discretionary trusts would be made available to him automatically upon his request. Mary Outwin received similar assurances regarding the funds to be placed in her irrevocable discretionary trust. To further allay their fears concerning the proposed transfers in trust, Mr. Thielbar and Mr. Bergreen assured the petitioners that, if at any time they became unhappy with the trust arrangements, the trustees would immediately liquidate the trusts by making discretionary distributions to them of the remaining corpus.

The proposed investment plan was implemented on December 24, 1969. On that date, the following trusts were created by petitioner:

Edson S. Outwin Revocable Trust
Edson S. Outwin Trust No. 1
Edson S. Outwin Trust No. 2
Edson S. Outwin Trust No. 3
Edson S. Outwin Trust No. 4

To each of the four discretionary trusts (Trusts Nos. 1, 2, 3, and 4) petitioner transferred property with a value of $335,188.60, or a total value of $1,340,754.40. The trustees of the discretionary trusts were Henry B. Thielbar, Morris H. Bergreen, and Mary M. Outwin.

Similarly, Mary M. Outwin created the following trusts:

Mary M. Outwin Revocable Trust
Mary M. Outwin Trust No. 1

To her discretionary trust (Trust No. 1), Mary Outwin contributed property with a value of $105,874.87. Henry B. Thielbar and Morris H. Bergreen were named trustees.

At the same time, the Outwin children formed a partnership known as the EHCP Holding Co. The EHCP Holding Co., the two revocable trusts, and the five discretionary trusts then transferred all their assets to a partnership called the Outwin Investment Co. (company).

The trust agreements for the Edson S. Outwin Trust Nos. 1 to 4 and the Mary M. Outwin Trust No. 1 (hereinafter referred to collectively as the discretionary trusts) contain parallel provisions. Each provides that the trust is irrevocable and that the grantor is to be the sole potential beneficiary during his or her

lifetime. The grantor's rights to distributions of income or principal are specified in the following articles:

FIRST: DISPOSITION OF INCOME DURING LIFE OF GRANTOR

A. During the life of the Grantor, the Trustees shall accumulate the net income of the Trust as received, and at the end of each calendar year shall add such accumulated net income to the principal of the trust, to be administered as part of the principal.

B. Notwithstanding the provisions of Paragraph A of this Article FIRST, subject to Articles THIRD and EIGHTH, the Trustees shall have the power, at any time or times, during any calendar year, in the life of the Grantor, prior to the addition of that year's net income to the principal, to pay to, or apply for the benefit of, the Grantor, such part, parts or all of such net income as the Trustees shall determine, in the Trustees' absolute and uncontrolled discretion.

SECOND: TRUSTEES' POWER TO DISTRIBUTE PRINCIPAL
DURING LIFE OF GRANTOR

Anything to the contrary notwithstanding, subject to Articles THIRD and EIGHTH, the Trustees shall have the power, at any time or times, in the life of the Grantor, to pay to, or apply for the benefit of, the Grantor, such part, parts or all of the principal of the trust as the Trustees shall determine, in the Trustees' absolute and uncontrolled discretion, for any reason whatsoever, notwithstanding that such payments may result in the termination of the trust.

Certain other provisions pertaining to the trustees' discretionary powers are contained in the eighth article, which provides in relevant part:

EIGHTH: TRUSTEES' DISCRETIONARY POWERS OVER INCOME AND PRINCIPAL

\*      \*      \*      \*      \*      \*      \*

B. *Payments and applications may be made without regard to beneficiary's independent resources*

The Trustees, in determining the amount of income or principal to be paid or applied to, or for the benefit of, any beneficiary under applicable Articles FIRST through SIXTH of this Agreement, are authorized, in the Trustees' discretion, to disregard or not to take into consideration such beneficiary's other resources, the amount of such beneficiary's independent property, or the extent to which such beneficiary may be entitled to support by a parent or any other person.

C. *Trustees' discretion shall be binding*

Any decision of the Trustees with respect to the exercise of the Trustees' discretionary powers, made in good faith, shall be a full and absolute protection to the Trustees and shall be conclusive and binding upon all persons interested in any trust created under this Agreement.

The third article of each trust agreement provides that no distributions may be made by the trustees pursuant to the first

or second articles without the prior written consent of the grantor's spouse in his or her individual capacity. Under the fourth article the grantor's spouse is also named as a second income beneficiary of the trust. In the event the second income beneficiary survives the grantor, he or she becomes entitled to mandatory distributions of the trust income on at least an annual basis. The trust corpus, on the other hand, is to be distributed to such person only in the absolute and uncontrolled discretion of the trustees. In addition, the second income beneficiary is given a special testamentary power of appointment over the corpus remaining at his or her death.

The 20th article of each trust provides for a committee of the trust comprised of the second income beneficiary and up to two additional members whom he or she may designate. The committee is authorized to remove any trustee with or without cause and appoint additional or successor trustees. Upon the death of the second income beneficiary, the committee may also designate a person or persons whose written consent must be obtained prior to any distributions to the grantor under the first or second articles. The foregoing powers vested in the committee are required to be exercised in a fiduciary capacity.

The assets transferred to petitioners' revocable and discretionary trusts consisted primarily of the funds in their investment accounts at Stein, Roe & Farnham. With the exception of their personal residence, some stock, and certain other real estate, virtually all of the petitioners' assets were placed in these trusts.

From 1971 through 1978, petitioner and his wife received salaries from the company in the amounts of $38,000 and $12,000, respectively. To supplement their income petitioner also withdrew considerable sums from the company in the form of loans. These loans, which averaged at least $5,000 per month, plus additional amounts when necessary, were unsecured and bore no interest. All loans were recorded on the books of the company as loans to the Edson S. Outwin Revocable Trust. The trust, in turn, established on its books a liability to the company for the amount of the advances and then distributed the funds to petitioner. During the period from 1970 to 1978, petitioner's withdrawals from the company in this manner were as follows:

| Year | Advances to Edson S. Outwin Revocable Trust | Repayments | Cumulative advances | Edson S. Outwin Revocable Trust capital account balance[1] |
|------|------|------|------|------|
| 1970 | $105,000 | | $105,000 | 0 |
| 1971 | 161,113 | | 266,113 | $766,360 |
| 1972 | 66,106 | | 332,219 | 775,285 |
| 1973 | 166,500 | | 498,719 | 782,502 |
| 1974 | 91,000 | $101,000 | 488,719 | 788,974 |
| 1975 | 76,000 | 6,000 | 558,719 | 794,035 |
| 1976 | 67,000 | | 625,719 | 811,469 |
| 1977 | 60,000 | | 685,719 | 623,799 |
| 1978 | 60,000 | | 745,719 | 634,920 |

[1] Per Outwin Investment Co. partnership income tax returns for the taxable years 1971 through 1978. The 1970 partnership return was not placed in evidence and the ending capital account balance for that year is unknown.

Since their formation, the Edson S. Outwin discretionary trusts have made no distributions or loans to petitioner. Consequently, Mary M. Outwin has never exercised her veto power over such distributions. Similarly, Mary M. Outwin has received no distributions or loans from her discretionary trust and petitioner has had no occasion to exercise his veto power.

The discretionary trust agreements provide that the trusts are to be administered and construed according to Massachusetts law.

On December 2, 1976, respondent issued statutory notices of gift tax deficiency for 1969 to each petitioner in the amount of $167,895.09. In each case, the additional gift tax was determined on one-half of the combined value of the assets contributed to the Mary M. Outwin Trust No. 1 and the Edson S. Outwin Trust Nos. 1 to 4.

### OPINION

We must decide whether the transfers by the petitioners to their respective discretionary trusts in 1969 constituted completed gifts subject to tax under section 2501. The gift tax

provisions of the Internal Revenue Code do not define the term "completed gift"[2] but it is well settled that a conveyance in trust will not be subject to gift tax where the donor retains dominion and control over the property transferred. *Estate of Sanford v. Commissioner*, 308 U.S. 39 (1939); *Burnet v. Guggenheim*, 288 U.S. 280 (1933); *Estate of Mandels v. Commissioner*, 64 T.C. 61 (1975); *Hambleton v. Commissioner*, 60 T.C. 558 (1973); *Estate of Holtz v. Commissioner*, 38 T.C. 37 (1962); sec. 25.2511–2(b), Gift Tax Regs. In the present cases, the discretionary trusts are irrevocable under the terms of the written trust agreements. In each instance, the grantor may receive lifetime distributions of trust income or corpus only in the "absolute and uncontrolled discretion" of the trustees. The trustees are empowered to distribute the entire corpus to the grantor even though such distribution results in the termination of the trust. Additionally, the trust agreements require the grantor's spouse to give his or her prior written consent in an individual capacity to any such distributions. Upon the death of the grantor, the surviving spouse acquires the right to mandatory distributions of trust income on at least an annual basis, plus distributions of principal in the unfettered discretion of the trustees. The grantor's spouse is also given a special testamentary power of appointment over the trust corpus. Under these circumstances, we must decide whether petitioners have sufficiently parted with dominion and control over their property so as to qualify the transfers as completed gifts.

Petitioners contend that no completed gifts resulted because the trustees of the discretionary trusts had orally agreed prior to the execution of the written agreements to (1) distribute the trust income or corpus whenever the grantors requested such funds, and (2) terminate the trusts upon their request by making liquidating distributions of all the remaining corpus. Consequently, petitioners maintain that they never relinquished dominion and control over the property transferred. In the alternative, they argue that under Massachusetts law the creditors of a grantor-beneficiary of a discretionary trust can reach the assets of the trust for satisfaction of their claims,

---

[2]Sec. 2511(a) provides that "section 2501 shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible."

notwithstanding the veto power over discretionary distributions vested in the grantor's spouse. Accordingly, they contend that the gifts are incomplete under the principle established in *Paolozzi v. Commissioner*, 23 T.C. 182 (1954).

Respondent contends that the evidence is insufficient to prove the existence of the oral agreements alleged by the petitioners, and that, even if such agreements did exist between the grantors and the trustees, there was no agreement between the grantors (petitioners) which would restrict the right of either grantor to veto distributions from the other's discretionary trust(s). Respondent further argues that the transfers in trust were completed gifts under sections 25.2511–2(b) and 25.2511–1(g)(2), Gift Tax Regs.,[3] since there are no fixed or ascertainable standards enforceable by or on behalf of the grantor which limit the trustees' discretion to make distributions. Finally, respon-

---

[3]Sec. 25.2511–2. Cessation of donor's dominion and control.

(b) As to any property, or part thereof or interest therein, of which the donor has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another, the gift is complete. But if upon a transfer of property (whether in trust or otherwise) the donor reserves any power over its disposition, the gift may be wholly incomplete, or may be partially complete and partially incomplete, depending upon all the facts in the particular case. Accordingly, in every case of a transfer of property subject to a reserved power, the terms of the power must be examined and its scope determined. For example, if a donor transfers property to another in trust to pay the income to the donor or accumulate it in the discretion of the trustee, and the donor retains a testamentary power to appoint the remainder among his descendants, no portion of the transfer is a completed gift. On the other hand, if the donor had not retained the testamentary power of appointment, but instead provided that the remainder should go to X or his heirs, the entire transfer would be a completed gift. However, if the exercise of the trustee's power in favor of the grantor is limited by a fixed or ascertainable standard (see paragraph (g)(2) of §25.2511–1), enforceable by or on behalf of the grantor, then the gift is incomplete to the extent of the ascertainable value of any rights thus retained by the grantor.

Sec. 25.2511–1. Transfers in general.

(g)(2) If a trustee has a beneficial interest in trust property, a transfer of the property by the trustee is not a taxable transfer if it is made pursuant to a fiduciary power the exercise or nonexercise of which is limited by a reasonably fixed or ascertainable standard which is set forth in the trust instrument. A clearly measurable standard under which the holder of a power is legally accountable is such a standard for this purpose. For instance, a power to distribute corpus for the education, support, maintenance, or health of the beneficiary; for his reasonable support and comfort; to enable him to maintain his accustomed standard of living; or to meet an emergency, would be such a standard. However, a power to distribute corpus for the pleasure, desire, or happiness of a beneficiary is not such a standard. The entire context of a provision of a trust instrument granting a power must be considered in determining whether the power is limited by a reasonably definite standard. For example, if a trust instrument provides that the determination of the trustee shall be conclusive with respect to the exercise or nonexercise of a power, the power is not limited by a reasonably definite standard. However, the fact that the governing instrument is phrased in discretionary terms is not in itself an indication that no such standard exists.

dent contends that under Massachusetts law the assets of a discretionary trust cannot be subjected to the claims of the grantor's creditors where (1) distributions are subject to the approval of the grantor's spouse, who is also a secondary beneficiary, and (2) there are no enforceable standards to limit the trustees' discretion in making such distributions. Thus, respondent maintains that the rule of law in *Paolozzi* is inapplicable. We hold for petitioners.

Where the trust agreement specifies, as here, that distributions to the settlor are to be made in the absolute discretion of the trustees, with no enforceable standard provided, the transfer is generally held to be complete for gift tax purposes. *Herzog v. Commissioner*, 116 F.2d 591 (2d Cir. 1941); *Rheinstrom v. Commissioner*, 105 F.2d 642 (8th Cir. 1939); *Estate of Holtz v. Commissioner*, 38 T.C. 37, 42 (1962); sec. 25.2511–2(b), Gift Tax Regs. Cf. *Commissioner v. Irving Trust Co.*, 147 F.2d 946 (2d Cir. 1945); *Estate of Toeller v. Commissioner*, 6 T.C. 832 (1946), affd. 165 F.2d 665 (7th Cir. 1948). A different result obtains, however, where State law permits creditors of the settlor-beneficiary to pierce the trusts for satisfaction of claims.

In *Paolozzi v. Commissioner*, 23 T.C. 182 (1954), the taxpayer created a trust under the terms of which the trustees were authorized to pay her so much of the trust income as they in their absolute discretion determined to be in her best interest. Upon her death, the trust assets were to be distributed to her issue. She reported a taxable gift when the trust was established in an amount equal to the value of the assets transferred reduced by the value of a life estate for an individual her age. Respondent determined that the amount of the gift should be undiminished by the value of the life estate since her interest in the trust income was at best an expectancy, and not susceptible of valuation by actuarial methods. This Court rejected respondent's determination on the ground that, under Massachusetts law, the creditors of a settlor-beneficiary of a discretionary trust could reach for satisfaction of claims the maximum amount which the trustee could pay to the settlor or apply for her benefit. Thus, we concluded that the taxpayer could at any time obtain the economic benefit of the trust income simply by borrowing and then forcing her creditors to look to her interest in the trust income for a source of repayment. On this basis, we held that the gift was incomplete to the extent of the value of

her life estate. Accord, *Vander Weele v. Commissioner*, 27 T.C. 340, 343–344 (1956), affd. 254 F.2d 895 (6th Cir. 1958) (involving Michigan law). See also *Estate of Holtz v. Commissioner*, 38 T.C. 37, 42 n. 3 (1962); *Herzog v. Commissioner*, 116 F.2d 591 (2d Cir. 1941) (reaching a contrary result under New York law); Rev. Rul. 76–103, 1976–1 C.B. 293. Cf. *Hambleton v. Commissioner*, 60 T.C. 558, 565–566 (1973).

Under the rule of *Paolozzi*, then, we must determine whether the assets of the Edson S. Outwin and Mary M. Outwin discretionary trusts could be subjected to the claims of the grantor's creditors under Massachusetts law, which governs the interpretation and administration of the trusts.

The general rule in this country regarding the rights of creditors of a settlor-beneficiary of a discretionary trust is expressed in 1 Restatement, Trusts 2d, sec. 156(2) (1959): "Where a person creates for his own benefit a trust for support or a discretionary trust, his transferee or creditors can reach the maximum amount which the trustee under the terms of the trust could pay to him or apply for his benefit." An example of the application of this rule is set forth in E. Griswold, Spend-thrift Trusts, sec. 481 (2d ed. 1947):

§ 481. Discretionary trusts. The settlor may attempt to retain a beneficial interest free from the claims of his creditors, by giving his property to a trustee and investing the trustee with complete discretion to decide whether the income shall be paid to him and, if so, how much of it. Thus, A may convey property to T on trust to pay to A during A's life so much of the income as in T's uncontrolled discretion he deems wise, with a provision that on A's death the principal and any accumulated income shall be conveyed to B. The remainder, so far as the principal is concerned, being a present vested remainder in B and not subject to A's control, is beyond the reach of A's creditors, unless the transfer is a fraudulent conveyance. Does the fact that the trustee is given discretion over the disposition of the income exempt the income, likewise, from the claims of creditors? The courts have very properly held that in such a case creditors of the settlor may reach the entire income from the trust property during his life. A person can not settle his own property so that it will be free from the claims of creditors and yet retain the right to receive the income, if it is paid to any one, during his lifetime. [Fn. ref. omitted.]

See also 2 A. Scott, Trusts, sec. 156.2 (3d ed. 1967); G. Bogert, Trusts & Trustees, sec. 228 (2d ed. 1965).

The Supreme Judicial Court of Massachusetts formally adopted this general rule in *Ware v. Gulda*, 331 Mass. 68, 117 N.E.2d 137 (1954). In that case, the settlor established a trust which

provided for payments of income or principal for her support and maintenance in the sole discretion of the trustee. During her lifetime, she was the sole potential beneficiary; upon her death, the property was to go to her two daughters and her son, who was also the named trustee. An attorney brought suit against the settlor for the purpose of collecting past-due legal fees and won a court order directing the Second National Bank of Boston, which became a successor trustee following the death of the settlor's son, to pay the claim out of the trust assets. Following an appeal by the bank, the Supreme Judicial Court upheld the order and offered the following explanation (117 N.E. 2d at 138):

> The substance of what happened is this. Louise with her own property created a trust of which she was, for her lifetime, to be the sole beneficiary, if there was to be one at all. The decision as to making or withholding payments, as to both principal and income, was to be entirely in the discretion of the trustee. She was to be incapable of making an assignment of any interest in the trust property, which was intended to be beyond the reach of creditors. At the moment there is no amount which the trustee has exercised its discretion to pay to Louise, although in the past it has made payments to her both of principal and of income.
>
> Merely because the trustee has not exercised the discretionary power conferred upon it by Louise seems to us to be an insufficient ground to distinguish this case in principle from the rule of years' standing we recently restated in Merchants National Bank v. Morrissey, 329 Mass. 601, 605, 109 N.E.2d 821, 823: *"The established policy of this Commonwealth long has been that a settlor cannot place property in trust for his own benefit and keep it beyond the reach of creditors. Pacific National Bank v. Windram, 133 Mass. 175; Jackson v. Von Zedlitz, 136 Mass. 342; Taylor v. Buttrick, 165 Mass. 547, 551, 43 N.E. 507; Forbes v. Snow, 245 Mass. 85, 89, 140 N.E. 418."*
>
> *The rule we apply is found in Restatement: Trusts, § 156(2): "Where a person creates for his own benefit a trust for support or a discretionary trust, his transferee or creditors can reach the maximum amount which the trustee under the terms of the trust could pay to him or apply for his benefit."* It has substantial support in authority. Greenwich Trust Co. v. Tyson, 129 Conn. 211, 224, 27 A.2d 166; Warner v. Rice, 66 Md. 436, 8 A. 84; Hay v. Price, 15 Pa.Dist.R. 144; Menken Co. v. Brinkley, 94 Tenn. 721, 728–729, 31 S.W. 92; Petty v. Moores Brook Sanitarium, 110 Va. 815, 817, 67 S.E. 355, 27 L.R.A.,N.S., 800; Scott, Trusts, § 156.2; Griswold, Spendthrift Trusts (2d ed.) § 481. See Am. Law of Property, § 23.18. Although every exercise of the power might take property away from the remaindermen, that is no objection where the trustee could pay the entire principal to the creator of the trust.
>
> [Emphasis added.]

Thus, the Massachusetts Court held that creditors of the settlor-beneficiary could reach the trust assets despite the fact that under the terms of the trust instrument, distributions by

the trustee to, or on behalf of, the settlor were completely within its discretion, and even though the interests of the remainder-men beneficiaries would be adversely affected by such action. See also *State Street Bank & Trust Co. v. Reiser*, 7 Mass. App. Ct. 633, 389 N.E.2d 768 (1979). The *Gulda* decision provided the basis for our holding in *Paolozzi v. Commissioner, supra,* to the effect that a settlor-beneficiary of a discretionary income interest in a Massachusetts trust had failed to relinquish dominion and control over such interest for gift tax purposes.

Respondent does not dispute the correctness of *Gulda* or its continued viability as a part of Massachusetts trust law. Nor does he challenge the propriety of our decision in *Paolozzi*. Rather, he seeks to distinguish those cases on the ground that discretionary distributions from the trusts herein require the prior individual consent of the grantor's spouse, who is also a remainderman beneficiary thereof. The presence of such a veto power in an interested party, respondent contends, imposes a significant limitation on the trustees' discretion and thereby removes these cases from the general rule of *Gulda*. We disagree.

After a rather extensive search of the law of Massachusetts as well as other jurisdictions, we have found no authorities, nor have the parties cited any, which have addressed this precise issue. The decision of the Mississippi Supreme Court in *Deposit Guaranty National Bank v. Walter E. Heller & Co.*, 204 So. 2d 856 (Miss. 1967), relied on by petitioner, is clearly distinguishable. There, the settlor created a trust and retained the right to request distributions of principal of up to 25 percent of the trust assets in any given year. Before the trustee could make such distributions, it was required to obtain the approval of a third party designated as "Advisor to the Trustee." The court allowed a creditor to attach the trust assets despite the incorporation of a spendthrift clause in the trust agreement and notwithstanding the approval power vested in the adviser (204 So. 2d at 861):

Of course, the withdrawals mentioned had to be with the approval of the advisor. This does not save the situation; for if there were no advisor it would have to be with the approval of the Trustee. In either event, if a man were setting up a trust of his own property and were naming the trustee and the advisor as in this case, it would be easy for him to select some person who would approve any demand for withdrawal that he made.

However, in contrast to the present cases, the individual vested

with the approval right did not have an interest in the trust which could influence the manner in which he exercised that right.

Nevertheless, it is our opinion that the veto power bestowed upon the grantor's spouse in connection with the trusts herein is insufficient to render the *Gulda* rule inapplicable. The *Gulda* opinion and the cases cited therein evidence a strong public policy in Massachusetts against persons placing property in trust for their own benefit while at the same time insulating such property from the claims of creditors. That policy would be easily frustrated if creditors were prevented from reaching the trust assets merely because the settlor's spouse is given an interest in the trust and the right to veto discretionary distributions which might deplete that interest. It is not unreasonable to assume that, because of the marital relationship, the settlor could anticipate the complete acquiescence of his spouse in any discretionary distributions which he might receive, regardless of their effect on her interest as a remainderman. Thus, in the absence of unforeseen circumstances, such as divorce, the possibility of a spousal veto in such a situation may be at best a remote possibility. This is particularly true in the present cases, where the fact that each spouse has the right to veto distributions from the other's discretionary trust(s) could discourage the exercise of that authority through fear of reprisal. For these reasons, we think that the veto powers held by the petitioners do not, by themselves, place the trusts outside the scope of the *Gulda* decision.

Respondent, however, argues that the interest of the grantor's spouse as a remainderman beneficiary makes him or her truly adverse in spite of the marital relationship. He draws an analogy between this case and certain gift tax authorities which hold that a power in the grantor to revoke or alter a trust does not render a gift incomplete if the power is exercisable only in conjunction with a person having "a substantial adverse interest" in the trust. Sec. 25.2511–2(c) and (e), Gift Tax Regs.; see *Latta v. Commissioner*, 212 F.2d 164 (3d Cir. 1954), cert. denied 348 U.S. 825 (1954); *Camp v. Commissioner*, 195 F.2d 999 (1st Cir. 1952); *Commissioner v. Prouty*, 115 F.2d 331 (1st Cir. 1940). Both *Camp* and *Prouty* indicate that the grantor's spouse may qualify as an adverse party if he or she possesses a direct legal or equitable interest in the trust property. Yet, while this may be

true for gift tax purposes, it does not necessarily follow that the concept is relevant in determining the rights of creditors under State law respecting assets placed in a discretionary trust for the settlor's own benefit. In the latter case, the principal concern is not whether a completed gift has occurred, but rather whether a transfer in trust will be permitted to shield the grantor's assets from the claims of present or future creditors. In that context we think the veto power held by the grantor's spouse would be ineffective to shelter the discretionary trust assets from such claims, even though the spouse qualifies as an adverse party under general gift tax principles.[4]

Respondent further contends that *Gulda* does not apply because there are no enforceable standards under State law to limit the trustees' discretion in making distributions to the grantors. In *Gulda*, the discretionary distributions were to be made for the "support and maintenance" of the settlor. Respondent contends that (1) such language creates an enforceable standard under Massachusetts law whereby the settlor could legally compel the trustees to distribute sufficient funds to satisfy that standard, and (2) to the extent the settlor had such a right, she had an interest which could be reached by creditors. Since there are no ascertainable standards to govern the trustees' discretion in the present cases, respondent maintains that the grantors had no enforceable right to discretionary distributions and therefore *Gulda* does not control.

Again we must disagree. Regardless of whatever judicial restrictions Massachusetts courts might place on the exercise of

[4]Although in *Prouty* the First Circuit stated that the donor's spouse could qualify as an adverse party, the Court did express some doubts on the matter and we share in its perceptions as they pertain to the issue before us (*Commissioner v. Prouty*, 115 F.2d 331, 335 (1940)):

"Examining these intimate family trusts, one must recognize an element of unreality in the inquiry whether a beneficiary's interest is substantially adverse to the grantor. The supposition is that, given a sufficient stake in the trust, the beneficiary is not likely to yield to a wish of the grantor to revoke the trust. In many cases the grantor may have full confidence in the compliant disposition of the member of the family he selects to share his power of revocation, even though such member is named as beneficiary of a handsome interest in the trust. The very fact that the grantor reserved a power to revoke indicates a mental reservation on his part as to the finality of the gift; and if the grantor wishes to hold on to a power of recapture, it stands to reason he will vest the veto power in someone whose acquiescence he can count on. * * * However, we cannot read into the gift tax, any more than into Sections 166 and 167, the proposition that a member of the grantor's immediate family can never be deemed to have "a substantial adverse interest." So far as the gift tax is concerned, it is fair enough to take the grantor at his word. * * * [Citation omitted.]"

the trustees' discretion, we see no basis for assuming that the *Gulda* decision was predicated on the existence of an enforceable right in the settlor to discretionary distributions. The rule adopted by the Massachusetts Supreme Court and set forth in 1 Restatement, Trusts 2d, sec. 156(2) (1959), refers only to amounts which the trustee *could* pay to the settlor; it makes no mention of amounts which the trustee could be *required* to pay in the event the settlor seeks judicial review of the trustee's actions. None of the authorities we have consulted cite the existence of an enforceable right to discretionary distributions as the rationale for the Restatement rule. See generally 2 A. Scott, Trusts, sec. 156.2 (3d ed. 1967), and the cases cited therein. Moreover, we note that this Court applied the *Gulda* rule in *Paolozzi* where the trust agreement required only that discretionary distributions of income be made in the settlor's "best interest," a standard generally considered to be less explicit than the support and maintenance provision found in *Gulda*. See 3 A. Scott, Trusts, sec. 187.2 (3d ed. 1967). Yet, this Court found it unnecessary to consider whether and to what extent the standard was judicially enforceable under Massachusetts law. Similarly, we applied the *Paolozzi* rule in *Vander Weele v. Commissioner*, 27 T.C. 340 (1956), affd. 254 F.2d 895 (6th Cir. 1958), without regard to the enforceability of the standard provided ("comfortable well-being and enjoyment") under Michigan law.

We hold, therefore, that creditors of the petitioners could reach the assets of their respective discretionary trusts for reimbursement under Massachusetts law, and under the holding of *Paolozzi* the petitioners have failed to surrender dominion and control over the trust assets.[5]

In reaching our decision in this case, we expressly disavow any reliance on the oral understandings between the petitioners and

---

[5]Although the transfers in trust in these cases are not subject to gift tax, the settlor's ability to secure the economic benefit of the trust assets by borrowing and relegating creditors to those assets for repayment may well trigger inclusion of the property in the settlor's gross estate under secs. 2036(a)(1) or 2038(a)(1). See *Estate of Uhl v. Commissioner*, 25 T.C. 22 (1955), revd. 241 F.2d 867 (7th Cir. 1957) (Seventh Circuit disagreed with this Court's finding that creditors of the settlor had the right to reach the trust assets under Indiana law, but did not directly dispute the conclusion that such a right, had one existed, would cause inclusion in the settlor's gross estate under the predecessor to section 2036(a)); Rev. Rul. 76–103, 1976–1 C.B. 293 (inclusion required under sec. 2038(a)); see also C. Lowndes, "Some Doubts About the Use of Trusts to Avoid the Estate Tax," 47 Minn. L. Rev. 31, 36–37 (1962).

the trustees to the effect that the trustees would be totally responsive to any requests from the petitioners for discretionary distributions. On occasion, this Court has considered extrinsic evidence, such as the settlor's financial condition, his purpose in establishing the trust, and oral assurances by the trustees that the funds would be made available upon request, to help determine whether a right to discretionary distributions rendered a transfer in trust incomplete for gift tax purposes. See *Estate of Holtz v. Commissioner*, 38 T.C. 37, 43–44 (1962); *Vander Weele v. Commissioner*, 27 T.C. 340, 345–346 (1956), affd. 254 F.2d 895 (6th Cir. 1958); *Gramm v. Commissioner*, 17 T.C. 1063, 1066 (1951). In each of these cases, however, a standard limiting the trustee's discretion was provided in the trust instrument and the extrinsic evidence served primarily to indicate the probability that the trust funds would be used to satisfy that standard. There are no ascertainable standards in the trust agreements before us. In fact, other than the requirement that the trustees act in good faith, there are absolutely no limitations placed on the trustees' discretionary authority. They are specifically directed to exercise their discretion without regard to the independent financial resources of any beneficiary, and without regard to whether any anticipated distributions would lead to the termination of the trust. Yet, these provisions vesting absolute discretion in the trustees are flatly contradicted by the oral understandings to which the petitioners and the trustees testified. We are inclined to give such testimony little weight for several reasons: (1) The petitioners' testimony is self-serving; (2) the trustees are close personal friends of the petitioners; and (3) the petitioners have yet to receive any distributions from their respective discretionary trusts.[6] Furthermore, we note that, while the testimony indicates that the petitioners received the specified assurances from trustees Henry B. Thielbar and Morris H. Bergreen, there is insufficient evidence to prove that either of the petitioners agreed in advance to consent to any proposed

---

[6]Petitioner Edson S. Outwin and trustees Henry B. Thielbar and Morris H. Bergreen testified that distributions from the discretionary trusts would eventually be necessary to pay off loans made by the Outwin Investment Co. to the Edson S. Outwin Revocable Trust, which loans currently exceed the revocable trust's capital account balance in the partnership. The fact remains, however, that the only distributions petitioner has received thus far have come from the revocable trust, and we see no reason to speculate on whether and to what extent distributions from the discretionary trusts might be forthcoming in the future.

distributions from the other's trust(s). Accordingly, we rest our decision in this case solely on the creditor's rights theory set forth in *Paolozzi*.

*Decisions will be entered for the petitioners.*