**UNION PACIFIC RAILROAD COMPANY and Affiliated Companies**

v.

**The UNITED STATES.**

**No. 311–84T.**

United States Claims Court.

Feb. 28, 1986.

As Revised on Motion for Reconsideration May 2, 1986.

James P. Holden, Washington, D.C., for plaintiff.

Theodore D. Peyser, Mildred L. Seidman and Donald H. Olson, Washington, D.C., with whom was Acting Asst. Atty. Gen. Roger M. Olsen, for defendant.

## OPINION

MARGOLIS, Judge.

The plaintiff, an accrual-basis taxpayer, brought this action to recover statutory interest in the amount of $72.8 million on overpayments of federal excess profits taxes for the years 1943 and 1944 (First and Second Claims), and on overpayments of federal income and declared value excess profits taxes for 1943, 1944, and 1945 (Third, Fourth, and Fifth Claims).[1] The defendant has moved for summary judgment on the first three claims; the plaintiff has cross moved for summary judgment on all the claims. After hearing oral argument and considering the entire record, the Court grants the defendant's motion for summary judgment on the First, Second, and Third Claims and grants in part the plaintiff's motion for summary judgment on the Fourth and Fifth Claims.

## FACTS

During World War II, the plaintiff and the country's other railroads hauled material for the Federal Government. Shipments intended for military use qualified for low "land-grant" freight rates prescribed by several Granting Acts and Equalizing Agreements. *See* Transportation Act of 1940, ch. 722, § 321(a & b), 54 Stat. 898, 954–55 (1940). The Government kept the contents of many cars secret. Other cars contained items for which the Government had not yet set a land-grant rate. In accordance with the Transportation Act and the Government's wishes, the railroads billed at the full commercial rate when they could not determine if the shipment qualified for the special rate.

The Act required railroads to refund to the Government the amounts by which the actual transportation charges exceeded the land-grant rates. Between 1941 and 1946 the plaintiff collected about $62 million in excess transportation charges, which it restored to the Government without interest from 1942 to 1957, after the U.S. General Accounting Office audited the wartime

charges and determined the proper rates. The Government collected the refunds by withholding payment of other transportation fees that it owed to the plaintiff. The parties called this process "cutting back," and called the refunds "cutbacks."

During the war, when the plaintiff reported the overcharges as revenue, the combined federal income and excess-profits tax rates reached 90%. In the years after the war, when the plaintiff refunded the overcharges and deducted the refunds, the rates were as low as 38%. Therefore, the plaintiff faced a net tax liability of up to $52 for every $100 of excess fees that it received and refunded, even though the excess fees brought the plaintiff a net income of $0.

By letter dated July 22, 1948, the plaintiff requested permission to allocate the refunds of excess transportation fees to the tax years during which it reported the fees as revenue. The Commissioner of the Internal Revenue Service (IRS) granted that permission on September 22, 1948. But moving cutback deductions from later years to earlier years would generate refunds in earlier years and deficiencies in later years. Because the refunds would have been unpaid longer than the deficiencies, the Commissioner would incur a net interest liability if he allowed the plaintiff to reallocate the cutback deductions. He therefore conditioned his permission upon an interest restriction. The plaintiff suggested changes, and the Commissioner sent a revised letter dated November 29, 1948 [hereinafter the "Cutback Agreement"]. The plaintiff accepted the agreement on December 14, 1948.

The Cutback Agreement provides:

The facts presented by you show conclusively that ... the taxable income for the years involved is not clearly reflected....

In view of the facts and circumstances presented, permission is granted under the authority conferred in section 43 of the Internal Revenue Code [of 1939] to

1. The parties have kept these tax years open by executing a series of waivers.

allocate, on the terms and conditions hereinafter stated, repayments heretofore or hereafter made of excessive transportation charges ... to the years in which such charges were included in taxable income....

In this connection, it is understood that you agree, as follows:

....

2. All refunds of transportation charges made by you to the Federal Government shall be allowed as deductions in the year or years in which such transportation charges were included in income, and any deductions claimed in the year or years such refunds were made shall be disallowed. This paragraph applies only to cutbacks on account of transportation charges in excess of land grant and reclassification rates, which were not contested or in controversy.

3. The amount of interest on refunds of income and excess profits taxes resulting from these adjustments shall be allowed only to the extent of, and limited to, the amount of interest on deficiencies resulting from these adjustments.

In its first three claims, the plaintiff demands interest on tax overpayments for 1943 and 1944 (cutback overpayments) that resulted from the retroactive deduction of excess transportation fees refunded in later years. The defendant asserts that paragraph 3 of the Cutback Agreement bars these claims because the plaintiff has received more interest on cutback overpayments than it has paid on the later deficiencies (cutback deficiencies) that arose when the Commissioner disallowed deductions for the years in which the plaintiff refunded the excess charges. The plaintiff answers that the interest restriction is either invalid or has been misapplied.

## DISCUSSION

### A. *Validity of the Cutback Agreement*

When the Commissioner permitted the plaintiff to deduct later years' refunds from earlier years' revenue, he invoked the following statute: "The deductions and credits ... provided for in this chapter shall be taken for the year in which 'paid or accrued' or 'paid or incurred,' ... unless in order to clearly reflect the income the deductions or credits should be taken as of a different period." 26 U.S.C.A. § 43 (1939 as amended) [1939 Code].

### 1. *The Commissioner's Discretion*

■ When the plaintiff deducted the refunds in the years it paid them, "the taxable income for the years involved [was] not clearly reflected," as the Commissioner admitted. The plaintiff argues that the statute entitled it to reflect its income clearly. Therefore, the Commissioner exceeded his authority when he imposed conditions unrelated to the object of the statute.

The plaintiff bases its argument upon *Gerli & Co. v. Commissioner,* 668 F.2d 691 (2d Cir.1982). In *Gerli,* a corporation hoped to liquidate its wholly owned Canadian subsidiary pursuant to 26 U.S.C. § 332 [1954 Code], which permits tax-free liquidation provided that "it is established to the satisfaction of the Secretary [of the Treasury] or his delegate that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes." 1954 Code § 367.

When Gerli requested a ruling under section 367, the Commissioner admitted that Gerli had no plan to avoid taxes, but he refused to issue a ruling unless Gerli agreed to report the subsidiary's accumulated earnings at the time of liquidation as dividend income. Gerli accepted the condition, but failed to report the income. The Commissioner disallowed the tax-free liquidation and assessed a deficiency, which the Tax Court upheld. The Second Circuit reversed, holding that "[t]here was nothing in the statute or in its legislative history to suggest that the Commissioner might impose, on the issuance of a favorable determination, conditions having no necessary logical relation to the issue determined,"

especially since the Commissioner admitted, and the facts showed, that the taxpayer qualified for the ruling. *Id.* at 697.

By enacting section 367 of the 1954 Code, Congress required the Commissioner to allow tax-free liquidation once he finds that the taxpayer has no purpose to avoid taxes. *Id.* at 698–99. The Commissioner cannot thwart the will of Congress by conditioning the performance of his duty.

In the present case, however, the Commissioner acted under the Income Tax statutes of the 1939 Code, subchapter B, part IV, "Accounting Periods and Methods of Accounting." Section 43 bears the title "Period for which deductions and credits taken." The Commissioner has broad power to modify a taxpayer's accounting methods, and in challenging the Commissioner's determination, the taxpayer must show a clear abuse of discretion. "It is settled that the Commissioner has discretionary authority to disallow [or to reallocate] a particular deduction on the ground that the *timing* of the payment distorts income." *Clement v. United States*, 217 Ct.Cl. 495, 510, 580 F.2d 422, 430 (1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 455 (1979) (emphasis added); *accord Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532, 99 S.Ct. 773, 780–81, 58 L.Ed.2d 785 (1979).

Section 43 permitted but did not compel the Commissioner to allow relation back of later deductions that the tax law would have restricted to the year of accrual. *See generally Healy v. Commissioner*, 345 U.S. 278, 284–85, 73 S.Ct. 671, 675, 97 L.Ed. 1007 (1953) (Annual accounting system requires taxpayers to report revenue and expenses in year of accrual, despite possible unfairness.). If he could disallow the retroactive deductions altogether, he could allow them conditionally.

### 2. *Alleged Abuse of Discretion*

■ Even if the Commissioner had broad discretion, the plaintiff argues that he abused it, because the plaintiff could have reallocated the cutback deductions without the Commissioner's permission.

The plaintiff was obliged to report the overcharges as taxable income in the year of receipt, because it collected those earnings under a claim of right and held them without restriction—even though the plaintiff was not entitled to retain the money and would eventually have to return it. *See, e.g., North American Oil Consolidated v. Burnet*, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932).

The plaintiff insists, however, that it could have deducted the overcharges in the year of receipt because it recognized its obligation to repay them. The plaintiff relies upon "an exception to the claim-of-right doctrine that applies when in the year of receipt a taxpayer recognizes his liability under an existing and fixed obligation to repay the amount received and makes provisions for repayment." *Hope v. Commissioner*, 55 T.C. 1020, 1030 (1971), *aff'd*, 471 F.2d 738 (3d Cir.), *cert. denied*, 414 U.S. 824, 94 S.Ct. 55, 38 L.Ed.2d 57 (1973); *see also Bates Motor Transport Lines v. Commissioner*, 17 T.C. 151 (1951) (allowing in year of receipt the deduction of amounts calculated and repaid in later years), *appealed and aff'd on other grounds*, 200 F.2d 20 (7th Cir.1952), *acq.*, 1951–2 C.B. 1.

But the plaintiff recognized no *fixed* obligation to repay *the* amount mistakenly received. The plaintiff did not know the amount mistakenly received. Because land-grant rates had not been set for many items, no one knew or could discover that amount. Defendant's Appendix 56, 69, 94, 107–08. The plaintiff could not deduct the cutbacks until all events occurred to fix the amount. *See, e.g., United States v. Anderson*, 269 U.S. 422, 441, 46 S.Ct. 131, 134, 70 L.Ed. 347 (1926). If the *Bates* case implies a different result, this Court must refuse to follow *Bates*.

■ The plaintiff also asserts that section 3806 of the 1939 Code would have permitted it to deduct the later repayments from earlier revenue or to take a credit for taxes earlier paid on excess profits. Section 3806 did restrict the Commissioner's

liability to pay interest, but not as severely as the Cutback Agreement.

Section 3806, however, applied only when taxpayers refunded excess profits to the United States after "renegotiation" of a contract. In this case, the parties never renegotiated their contract. When the parties charged and paid the legal fare retroactively, they carried out their original understanding. As the Tax Court noted in a similar case, "The situation presented here concerns a repayment based only on a legal claim of overpayment. To apply section 3806 to this situation would extend its coverage to unwarranted limits." *Fleet Carrier Corp. v. Commissioner*, 37 T.C. 527, 538 (1961), *acq.*, 1962–2 C.B. 4.

■ The plaintiff has tried to show that the Commissioner abused his discretion by imposing conditions upon deductions that the plaintiff could have taken without his permission. If the plaintiff did qualify for these deductions, which the court doubts, this argument undermines the plaintiff's position. The plaintiff had legal advice during and after the war. The Internal Revenue Code was known by the plaintiff. The plaintiff knew the alternatives and made its choice.

Furthermore, because retroactive deductions were allowed, the plaintiff collected nearly $16 million of cutback overpayments that the Commissioner can no longer recover. In a similar case, the Court of Claims remarked:

> It would obviously be inequitable to allow the plaintiff to renounce the agreement when the Commissioner cannot be placed in the same position he was when the agreement was executed. A clear case for the application of the doctrine of equitable estoppel exists and should be applied. *Cf. R.H. Stearns Co. v. United States*, 291 U.S. 54 [54 S.Ct. 325, 78 L.Ed. 647 (1934)].

*Guggenheim v. United States*, 111 Ct.Cl. 165, 182, 77 F.Supp. 186, 196 (1948), *cert. denied*, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441 (1949).

## B. *Alleged Misapplication of the Cutback Agreement*

The plaintiff argues that if the Cutback Agreement is valid, the Commissioner has misapplied it.

### 1. *"Refund" and "Credit"*

■ The Agreement provides: "The amount of interest on *refunds* of income and excess profits taxes resulting from these adjustments shall be ... limited to, the amount of interest on deficiencies resulting from these adjustments (emphasis added)." The Government returned tax overpayments by *crediting* them against other obligations of the plaintiff. In tax terminology a credit is not a refund, though the words have similar meanings in general usage. *See, e.g., Martin-Marietta Corp. v. United States*, 189 Ct.Cl. 291, 300–02, 418 F.2d 502, 506–08 (1969). The Commissioner knows tax terminology. He drafted the Agreement. The Agreement does not restrict interest payable on credits. Therefore, the plaintiff demands that interest.

When interpreting revenue statutes, courts hold the Government to the words it has chosen and resolve doubts in favor of the citizen. *See Estate of Renick v. United States*, 231 Ct.Cl. 457, 463, 687 F.2d 371, 376 (1982) (citing cases). But the Cutback Agreement is a contract, not a statute. Courts construe ambiguous provisions of a contract against the drafter only if the interpretation offered by the non-drafting party is reasonable. *See, e.g., Tri-Cor, Inc. v. United States*, 198 Ct.Cl. 187, 211, 458 F.2d 112, 126 (1972). The plaintiff offers no convincing reason why the Commissioner would agree to pay interest on credits when he refused to pay interest on refunds.

Furthermore, the U.S. Court of Claims construed the Cutback Agreement in an earlier action and found that the parties intended "[t]o relieve the Commissioner of such a net interest liability ..." when he permitted retroactive deduction of the cutbacks. *Union Pacific Railroad v. United States*, 208 Ct.Cl. 1, 36, 524 F.2d 1343, 1360

(1975), *cert. denied,* 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 89 (1976). The Commissioner would incur interest liability whether that interest would accrue on refunds or on credits. Therefore, to require the Commissioner to pay interest on these credits would be to frustrate the parties' intent.

### 2. *Calculation of Cutback Deficiencies After 1954*

■ The Agreement requires the Commissioner to pay the same amount of interest on cutback overpayments that he collects on cutback deficiencies. According to the plaintiff, cutback overpayments and deficiencies "must be identified by comparing a 'baseline' tax computation (*i.e.,* a computation of tax liability made as if the 1948 agreement did not exist) to the tax liability as it is finally computed, taking account of the 1948 agreement." *Plaintiff's Cross Motion* at 32. The plaintiff argues that the Government computed too small a cutback deficiency for each of the years 1954, 1955, and 1956 because it failed to consider section 1341 of the 1954 Code when it computed the "baseline" liability. (This statute was first enacted in 1954.)

Section 1341 applies when a taxpayer repays during the tax year a substantial amount received under a claim of right in an earlier year. The section fixes the tax as the lesser of these amounts:

(4) The tax for the taxable year computed with such deduction; or

(5) an amount equal to—

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

1954 Code § 1341(a)(4 & 5).

Had the Commissioner allowed the plaintiff to compute its baseline taxes for the years 1954–56 applying section 1341, plaintiff's baseline taxes would have been much lower. The deficiencies would have been much higher when the Commissioner later disallowed the cutback deductions, and the plaintiff could have collected interest on earlier cutback overpayments equal to the interest on the large cutback deficiencies for 1954–56.

But the plaintiff was not permitted to compute its taxes according to section 1341, because section 1341 applies only if a deduction for the repayment "is allowable for the taxable year." *Id.* at (a)(2). The Cutback Agreement provides that "any deductions claimed in the year or years such refunds were made *shall be disallowed* (emphasis added)." Thus, the Cutback Agreement established that cutback deductions would not be allowable for the tax years in question. Hence, section 1341, by its own terms, cannot apply.

The court finds the Commissioner's approach to calculating cutback deficiencies for the years in question consistent with the intent of the parties to the Cutback Agreement and the language of the Code.

### 3. *The 1942 Cutback Overpayment*

■ In 1960 the Commissioner reexamined the plaintiff's 1942 tax returns and discovered a deficiency of about $15.9 million. The deficiency did not result from cutbacks. He also determined that the Government owed the plaintiff cutback overpayments of about $11.3 million. He could have collected interest on the non-cutback deficiency immediately and without limit. He might have had to pay interest on the cutback overpayment, but only to the extent that the plaintiff might owe interest on later cutback deficiencies. Instead of computing, collecting, and paying that interest, he subtracted the cutback overpayment from the non-cutback deficiency and assessed a net deficiency of $4.6 million plus interest of $.3 million.

The plaintiff brought an action to recover interest on the overpayment, but the Court of Claims upheld the Commissioner's decision. *See Union Pacific,* 208 Ct.Cl. at

34–41, 524 F.2d at 1359–63. The court noted:

> Had the Commissioner not applied the $11.3 million overassessment of excess profits taxes resulting from the cutbacks to the $15.9 million deficiency, plaintiff would have been called upon to pay the $15.9 million deficiency resulting from adjustments other than cutbacks, instead of the actual deficiency of $4.6 million. Had the plaintiff been granted its wish that it be paid interest for the years since 1943 on the $11.3 million overassessment, it could not have escaped liability for interest on the $15.9 million deficiency. In economic effect, therefore, plaintiff has received the interest on the $11.3 million which it is now claiming.

*Id.* at 40, 524 F.2d at 1363.

The defendant now argues that the Commissioner allowed the plaintiff $11,890,512 of interest on the 1942 cutback overpayment when he decided in 1960 not to collect $11,890,512 of interest on non-cutback deficiencies. The defendant concludes that since the plaintiff has not paid more than $11,890,512 of interest on cutback deficiencies, it can claim no interest on cutback overpayments.

The plaintiff admits that it had the benefit of interest that the Commissioner could have assessed. *Plaintiff's Cross Motion* at 37. But the Commissioner never assessed the interest; it is too late to assess the interest; and—according to the plaintiff—the Commissioner cannot collect interest he failed to assess by claiming to have "allowed" it and by withholding an equal amount of interest otherwise due to the plaintiff. The defendant "allowed" no interest by credit or by check. And in the plaintiff's earlier action, an IRS agent examined the interest computations for 1942 and testified, "[T]here is nothing here in any of these things shown that shows that any interest was *allowed* on an overpayment...." Transcript at 1376, *Union Pacific* (emphasis added).

The Court's task is not to define "allow," but to determine what the parties intended. *See, e.g., Petrofsky v. United States,* 203

Ct.Cl. 347, 356, 488 F.2d 1394, 1399 (1973) (Contract must be construed to effectuate its spirit and purpose.). The purpose of the interest restriction is "[t]o relieve the Commissioner of a net interest liability...." *Union Pacific,* 208 Ct.Cl. at 36, 524 F.2d at 1360. Because he credited a cutback overpayment against a non-cutback deficiency, the Commissioner collected less interest than he would have collected absent the Cutback Agreement. Cutback overpayments have cost him more interest than cutback deficiencies have cost the plaintiff. The parties did not intend this result. Therefore, the plaintiff can claim no interest on cutback overpayments until the interest it pays on cutback deficiencies exceeds the interest it has already received in economic effect.

## C. *The Fourth and Fifth Claims*

As to the plaintiff's Fourth and Fifth Claims, the defendant admits liability but challenges the plaintiff's calculation of the amount and raises a question concerning the proper rate for computing interest. The Court therefore grants the plaintiff's motion for summary judgment on the Fourth and Fifth Claims with regard to liability only.

## CONCLUSION

The Court grants the defendant's motion for summary judgment on the first three Claims and grants the plaintiff's motion for summary judgment on the Fourth and Fifth Claims with regard to liability only.